**REESE LLP**
Michael R. Reese
100 West 93rd Street, 16th Floor
New York, NY 10025
Telephone: (212) 643-0500
mreese@reesellp.com

**KALIELGOLD PLLC**
Jeffrey D. Kaliel (*pro hac vice* forthcoming)
jkaliel@kalielpllc.com
1100 15th Street NW, 4th Floor
Washington, D.C. 20005
Telephone: (202) 350-4783

**KALIELGOLD PLLC**
Sophia G. Gold (*pro hac vice* forthcoming)
sgold@kalielgold.com
490 43rd Street, Suite 122
Oakland, CA 94609
Telephone: (202) 350-4783

*Counsel for Plaintiffs and the Proposed Classes*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| LATOYA MADDEN and AMY TAYLOR, on behalf of themselves and all others similarly situated,<br>Plaintiffs,<br><br>v.<br><br>OBLIGO, INC.,<br><br>Defendant. | Case No. 26-cv-8873<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Latoya Madden and Amy Taylor ("Plaintiffs") bring this action on behalf of themselves and all others similarly situated, against Defendant Obligo, inc. ("Obligo" or "Defendant"), and allege, upon personal knowledge as to Plaintiffs' own actions, Plaintiffs' counsel's investigation, and upon information and good faith belief as to all other matters, as follows:

**NATURE OF THE ACTION**

1. Paying for rental housing is a major financial undertaking for many individuals. That burden is made even heavier by Defendant Obligo, which contracts with landlords to charge tenants so-called "Service Fees" on top of their lease payments in order to avoid having to submit a security deposit at the time of leasing.

2. The fees are exorbitant, and in marketing and sign-up processes, Obligo misrepresents and omits key information about the nature of the product it is selling and the Service Fee charged for that product. In marketing, Obligo fails to inform consumers of the true costs—in comparison to a security deposit—of using its product; that using the product entails no protections provided by landlord tenant law regarding security deposits or their return; that using the product means giving a landlord *unencumbered access* to a tenant bank account to make any withdrawals it claims, up to a security limit; and that the Service Fee is not really for use of the service or the platform, but is a personalized, risk-based fee to compensate Obligo for profit and for the limited risk that a bank account won't have sufficient funds to cover the amounts claimed by a landlord.

3. As described in further detail below, Obligo's marketing and sign-up process are designed to misrepresent and obfuscate the true costs of the product, the workings of a novel financial product not well-understood by consumers, and the reasons for and basis of the Service Fee assessment.

4. In short, the product is a very bad deal for most consumers, who would not choose to pay for the product if the truth of the product were presented in marketing and during the sign-up process.

## PARTIES

5. Plaintiff Latoya Madden is a citizen, resident, and, at all relevant times alleged herein, a tenant of a property in Birmingham, Alabama. On multiple occasions, she paid Obligo's Service Fee.

6. Plaintiff Amy Taylor is a citizen and resident of Altoona, Iowa, and, at all relevant times alleged herein, was a tenant of a property in Windsor Heights, Iowa. On multiple occasions, she paid Obligo's Service Fee.

7. Obligo is a corporation with its principal place of business in New York, New York.

## JURISDICTION AND VENUE

16. This Court has original jurisdiction of this action under the Class Action Fairness Act of 2005. Pursuant to 28 U.S.C. § 1332(d), this Court has original jurisdiction because:

a. the proposed Class is comprised of at least 100 members; § 1332(d)(5)(B);

b. at least one member of the proposed class is a citizen of a State other than the State of which Obligo is a citizen, § 1332(d)(2)(A); and

c. the aggregate claims of the putative class members exceed $5 million, exclusive of interest and costs. § 1332(d)(2), (6).

17. Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Obligo is subject to personal jurisdiction here, regularly conducts business in this District, and because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this District.

## FACTUAL BACKGROUND AND GENERAL ALLEGATIONS

### A. How Obligo's Security Deposit Alternative Works

18. Several companies, including Obligo, have created so-called security deposit alternatives. These are third-party financial products that tenants are forced or strongly encouraged by their landlords to purchase from a third party in lieu of paying a security deposit. When signing up for the product, the tenant provides Obligo with authorization to directly withdraw funds from their bank account or charge their credit or debit card up to a specified amount. The tenant must also pay a non-refundable fee on a monthly or annual basis. If the landlord files a claim, Obligo withdraws funds from the tenant's bank account or credit card immediately and pays it to the landlord.

19. Obligo does not require any proof of claims from the landlord before deducting funds from tenants' accounts, which leaves tenants subject to unsubstantiated or improper damages claims from their landlord.

20. The Service Fee charged by Obligo for this product is substantial, adding hundreds of dollars to annual rent costs. There is a simple upshot to this: *compared to a tenant who receives their full security deposit back at the end of the tenancy, a tenant who uses a security deposit alternative product like Obligo's will always pay more*. This is because security deposit alternative products are nonrefundable, and any money spent on the security deposit alternative product is simply gone for good at the end of the tenancy.

21. Obligo strikes deals with landlords, who agree to require or strongly encourage tenants to use Obligo products. Consumers are in turn directed by their landlords to the Obligo website in order to be allowed to live in an apartment.

22. Obligo provides marketing and talking points to landlords to push tenants or require tenants to use the Obligo product.

**B. Obligo's Deceptive Marketing and Sign-Up Screenflow**

23. At the time of leasing a residential unit, a tenant's landlord directs the tenant to Obligo's website. That website represents that, as long as a tenant uses Obligo's "platform," the tenant can avoid paying a security deposit to her landlord.

24. The marketing and sign-up process obscures the fact that the cost and product structure are a very bad deal for consumers, as the product is described in vague terms with no warning or true costs or risks of using it.

25. The sign-up process begins with an email—designed by Obligo—sent by a tenant's landlord, like the below:

PMI REALTY CENTRAL IOWA Obligo

Dear Amy Taylor,

PMI Central Iowa uses Obligo to handle security deposits and move-in payments for their residents. Through Obligo, you can also qualify to rent deposit-free!

Use the following link to fulfill your $1300 security deposit and move-in requirements.

Click here to continue

Raw link: https://tenant.myobligo.com/invitation/UwaDb7PLSJADq1O3ywB?t=91e17739-180b-4d64-863e-7245667d9808

26. The welcome email deceptively claims a tenant can "quality" to avoid having to pay a deposit. The email never states just how expensive that 'privilege' will be. Further steps in the sign-up process continue to hide the true costs of being allowed to "rent deposit-free."

27. The link in the email directs to an Obligo website that automatically opts consumers into using the Obligo product—prominently highlighted with a blue "continue" button—and forces consumers to affirmatively opt out in order to simply pay a security deposit. Zero information is

provided regarding the cost of using the Obligo product:




28. For example, Plaintiff Taylor paid $200 to have a $1300 security deposit waived. However, she did not know how much that 'privilege' would cost until after she was forced to choose.

29. Following the sign-up process, screens continue the deception. The next screen makes three representations, all of which are deceptive, incomplete, and none of which describe the true costs and risks of using the Obligo product:

**Use your cash, your way**

**Put your money toward life's essentials, not tying it up in a security deposit.**

**With Obligo, you can move in faster and easier, without paying a large security deposit upfront.**

**Built to support you**

**Get support for move-out charge disputes, plus the flexibility to pay over time.**

30. Each of these representations is false and incomplete, and none describe the true nature and costs of the product.

31. As a result, consumers do not understand that their money is not being used for move-out charges and do not understand that funds are pulled immediately from their account in whatever amount the landlord desires.

32. Consumers do not understand that Obligo is granted the right to reach into their bank accounts, automatically, for amounts they do not know and might not agree with. This is never disclosed in the marketing. Instead, Obligo says the opposite, indicating that when there is a dispute, consumers will have the chance to dispute prior to the money being taken.

33. Consumers do not understand they will still have to pay their landlord for any claimed charges, in addition to the fees paid to Obligo, and that Obligo will pull such money from their accounts unilaterally and without an agreement with consumers on the amount.

34. Obligo conflates its product with a security deposit, including in the welcome email.

35. Obligo misrepresents and omits the truth about its product, which, in fact, performs nothing like a security deposit as that term is understood by reasonable consumers.

36. Traditionally, residential landlords require tenants to pay refundable cash security deposits to protect themselves against the risk that a tenant might not pay rent or might damage the property. To protect against landlord abuses regarding the use and return of security deposits, states, including Alabama and Iowa (where Plaintiffs reside, respectively), have laws regulating how landlords may use and refund these deposits, limits on the amount of the deposit, and remedies

for improper retention of a deposit.

37. In short, a "security deposit," as that term is generally understood by reasonable consumers, such as the Plaintiffs, is an amount of money that is paid once, held in trust by a landlord, then paid back in full to a tenant at move-out, minus any deductions allowed by state law. In other words, tenants usually get their money back.

38. Despite conflating its product with security deposits, Obligo's product functions nothing like a security deposit.

39. Any money paid to Obligo is gone forever and never repaid to tenants, unlike a security deposit. Worse, in the event a landlord claims damage or non-payment of rent, the tenant is still fully responsible for paying all charges, despite having also paid Obligo. Also, unlike a security deposit, Obligo affords tenants none of the protections of state security deposit law, such as challenging improper charges by a landlord.

### C. The Obligo Service Fee is Deceptive, Misdescribed, Discriminatorily Priced, and Not Disclosed Until Late in the Sign-Up Process

40. In order to use the Obligo "Platform" and avoid a security deposit, a tenant is required to enter personal and sensitive information, including banking account details. Obligo analyzes this personal information, including bank account balance information and credit history, to set a so-called "Service Fee" that a tenant must pay to Obligo to avoid paying a security deposit to their landlord.

41. The Obligo Service Fee amounts to several hundred dollars a year for most consumers.

42. The Service Fee is not disclosed until after a consumer enters personal and sensitive financial information, including bank account information. Indeed, the hefty Obligo fee is not disclosed to consumers until late in the checkout process and *after* they have committed to

providing sensitive financial information. This is a classic example of "drip pricing," a known deceptive practice.

43. The "service" provided by Obligo on its platform is simple: It analyzes personal financial information of tenants; it processes withdrawals from tenants' accounts when landlords make claims; and/or it acts as a debt collector on amounts paid by Obligo to landlords for claimed move-out charges.

44. Obligo misrepresents and omits material information regarding the nature and purpose of the Service Fee it assesses on consumers. Obligo claims on its website and in other representations to consumers that the Service Fee "covers the use of our qualification technology and platform."[1]

45. It also states:

> Obligo charges a fee for the use of our service, which allows you to skip paying a security deposit or choose from additional ways to fulfill your security requirement.
>
> The service fee is a percentage of your security deposit requirement and is determined by each renter's individual profile. This includes a variety of factors utilized by our machine learning model, including but not limited to a renter's geography, property type, bank account balance, and security to rent ratio.[2]

46. What Obligo *does not* tell consumers, such as Plaintiffs, is that the Service Fee is not for use of the "platform," but is a personalized, risk-based fee set by a machine learning model using consumers' individual financial information and geographic location.

47. The Fee is not for use of the platform or for use of the "service," as such costs could not possibly amount to the hundreds of dollars charged by Obligo. Further, use of the "platform" does not vary by consumer, but Obligo's fees vary wildly amongst consumers. This is per se

---

[1] *See* https://www.obligo.com/for-renters

[2] *See https://help.myobligo.com/en/articles/7156575-how-does-the-obligo-fee-work*

evidence that the fee is not for use of the platform but is rather a fee for risk and for profit.

48. Contrary to New York law, Obligo does not prominently disclose to consumers at the time of checkout that the Service Fee is determined on a personalized basis by an algorithm, which uses personal financial information to do so.

49. The Service Fee is not for a service and not for use of the Obligo "platform," but is in fact comprised of two things: Payments to Obligo to compensate for the risk that a linked bank account or credit card has insufficient funds to cover a landlord's claim and profit for Obligo.

50. Because Obligo's entire model is premised on its AI-enabled ability to identify creditworthy tenants and requiring those tenants to provide immediate, unencumbered access to their bank accounts, the risk of insufficient funds in a tenant account is vanishingly small. That means virtually the entirety of any given Service Fee paid to Obilgo is profit.

### D. Obligo Attempts an End Run Around the Protections Provided by Alabama and Iowa Landlord-Tenant Law

46. In Alabama, where Plaintiff Madden's dwelling is located, security deposits cannot be nonrefundable, regardless of how styled or what an underlying lease says. They are simply not allowed. Under Alabama Code § 35-9A-201, money held as a security deposit must be accounted for and returned to the tenant upon the end of the tenancy

48. Tenants in Alabama have an absolute right to go to court to recover security deposits and/or to contest claims for damage or unpaid rent wrongfully made by a landlord. Obligo's fine print attempts to deprive tenants of these rights and may not be enforced.

49. In Iowa, where Plaintiff Taylor's dwelling was located, security deposits cannot be nonrefundable, regardless of how styled or what an underlying lease says. They are simply not allowed. In Iowa, security deposits are legally refundable under Iowa Code section 562A.12,

meaning a landlord cannot label a standard security or damage deposit as completely non-refundable.

53. Tenants in Iowa have an absolute right to go to court to recover security deposits and/or to contest claims for damage or unpaid rent wrongfully made by a landlord. Obligo's fine print attempts to deprive tenants of these rights and may not be enforced.

### F. Plaintiff Madden's Experience

73. At all times relevant, Plaintiff Madden rents a dwelling in Birmingham, Alabama, and has paid an Obligo Service Fee.

74. Plaintiff paid Obligo $262.90 for the first year of her lease plus further monthly fees after the initial term.

75. Plaintiff viewed the Obligo welcome email, website, and marketing thereon.

76. Plaintiff did not know she was not required to use the Obligo product.

77. Plaintiff did not know the payments she made to Obligo were entirely nonrefundable, unlike a security deposit.

78. Plaintiff did not know she was still required to pay any claims by her landlord for damage or missed rent, despite having made substantial payments to Obligo, unlike a security deposit.

79. Plaintiff did not know Obligo's product was not truly a security deposit.

80. Plaintiff did not know she lacked state law protections governing security deposits.

81. Plaintiff did not know she would have to continue to pay Obligo for the duration of her lease and would be required to renew her purchase with Obligo each lease term.

82. Had Plaintiff known the truth about the Obligo product, she would not have used the product and would have looked for alternative means to satisfy her landlord or would have found a different dwelling that did not require use of Obligo.

**G. Plaintiff Taylor's Experience**

83. At all times relevant, Plaintiff Taylor rented a dwelling in Windsor Heights, Iowa, and has paid an Obligo Service Fee.

84. Plaintiff paid $178.80 to Obligo for a Service Fee for her lease term and was also charged by Obligo for over $300 in so-called move-out charges claimed by her landlord.

85. Plaintiff viewed the Obligo welcome email, website, and marketing thereon.

86. Plaintiff did not know she was not required to use the Obligo product.

87. Plaintiff did not know the payments she made to Obligo were entirely nonrefundable, unlike a security deposit.

88. Plaintiff did not know she was still required to pay any claims by her landlord for damage or missed rent, despite having made substantial payments to Obligo, unlike a security deposit.

89. Plaintiff did not know Obligo's product was not truly a security deposit.

90. Plaintiff did not know she lacked state law protections governing security deposits.

91. Plaintiff did not know she would have to continue to pay Obligo for the duration of her lease and would be required to renew her purchase with Obligo each lease term.

92. Had Plaintiff known the truth about the Obligo product, she would not have used the product and would have looked for alternative means to satisfy her landlord or would have found a different dwelling that did not require use of Obligo.

## CLASS ACTION ALLEGATIONS

1. Plaintiffs bring this action on behalf of themselves and on behalf of all others similarly situated. The proposed Classes include:

> During the fullest period allowed by law, all persons who paid Obligo for a Service Fee (the "Nationwide Service Fee Class").

2. Plaintiffs further bring this action individually and as a representative of all those similarly situated and the members of the following subclasses:

> During the fullest period allowed by law, all persons in Alabama who paid Obligo for a Service Fee (the "Alabama Service Fee Class").
>
> During the fullest period allowed by law, all persons in Iowa who paid Obligo for a Service Fee (the "Iowa Service Fee Class").

3. The Nationwide Class and state Subclasses are collectively referred to herein as the "Class."

4. Excluded from the Class are Defendant, its subsidiaries and affiliates, officers, directors and members of their immediate families and any entity in which Defendant has a controlling interest, the legal representatives, heirs, successors or assigns of any such party, the judicial officer(s) to whom this action is assigned, and the members of their immediate families.

5. Plaintiffs reserve the right to modify or amend class definitions and/or to add a class(es), if necessary, before this Court determines whether certification is appropriate.

6. Class members are numerous such that joinder is impracticable. Upon information and belief, and subject to class discovery, the Class consists of thousands of members or more, the identities of whom are within the exclusive knowledge of and can be ascertained only by resort to Defendant's records. The Class is also sufficiently ascertainable because Defendant has the

capability through its computer systems and other business records to identify all members of the proposed Class, and such specific information is not otherwise available to Plaintiffs.

7. The questions here are ones of common or general interest such that there is a well-defined community of interest among the proposed Class members. These questions predominate over questions that may affect only individual Class members because Defendant acted on grounds generally applicable to the proposed Class. Such common legal or factual questions include, but are not limited to:

a. Whether Defendant's marketing, website representations, and/or checkout process regarding its product is unfair, unlawful, deceptive, or misleading;

b. Whether Plaintiffs and the Class are harmed by Defendant's alleged misconduct;

c. Whether Defendant is unjustly enriched;

d. Whether Plaintiffs and the Class are damaged and if so, the proper measure of damages; and

e. Whether an injunction is necessary to prevent Defendant from continuing to engage in the wrongful conduct alleged herein.

8. Plaintiffs' claims are typical of the claims of the other proposed Class members in that they arise out of the same wrongful business practices by Defendant, as alleged herein.

9. Plaintiffs are more than adequate representatives of the proposed Class in that they suffered damages because of Defendant's improper business practices. Additionally:

a. Plaintiffs are committed to the vigorous prosecution of this action on behalf of themselves and all others similarly situated and retained

competent counsel experienced in the prosecution of consumer class actions;

b. There is no conflict of interest between Plaintiffs and other Class members;

c. Plaintiffs anticipate no difficulty in the management of this litigation as a class action; and

d. Plaintiffs' legal counsel has the financial and legal resources to meet the substantial costs and legal issues associated with this type of litigation.

10. Common questions of fact or law concerning Defendant's liability to all Class members for charging the Billing fee and processing fee on rent payments through its payment platform predominate over any questions affecting only individual Class members. Plaintiffs' proposed class action is the superior method for resolving this dispute because it is impracticable to bring proposed Class members' individual claims before the Court, especially where, as here, individual Class members' damages are relatively small. Class treatment permits many similarly situated persons or entities to prosecute their common claims in a single forum simultaneously and efficiently and without the unnecessary duplication of evidence, effort, expense or the possibility of inconsistent or contradictory judgments that numerous individual actions would engender. The benefits of the class action mechanism, including providing injured persons or entities with a method for obtaining redress on claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action.

11. Defendant has acted or refused to act on grounds generally applicable to each member of the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

12. Plaintiffs' claims consist of issues that are common to all members of the Class and are capable of class-wide resolution that will significantly advance the litigation.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**Violations of New York General Business Law § 349**
**Deceptive Business Acts and Practices**
***(By Plaintiffs, individually, and on behalf of the Nationwide Classes)***

13. Plaintiffs, individually and on behalf of the Nationwide Classes, reallege and incorporate the preceding paragraphs as if fully set forth herein.

8. New York General Business Law ("GBL") § 349(a) declares unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state."

9. Defendant committed unfair, abusive, and deceptive acts, omissions, and practices directed at Plaintiffs and Class members, including, but not limited to:

a. Naming and marketing its product as a "Security Deposit Alternative," and representing that it "replaces your traditional security deposit," when the product has none of the defining characteristics of a security deposit;

b. Misrepresenting that its product "covers your rental just like a cash deposit would," when the payments are nonrefundable, whereas a cash deposit is refundable;

c. Omitting that payments to Defendant are never returned to the tenant and omitting that the product must be repurchased for each lease term and paid for throughout the tenancy;

d. Omitting that no portion of the amounts paid to Defendant is applied to offset any claim by the landlord, and that Defendant will seek to recover from the tenant the full amount of any claim it pays;

e. Representing that renters "save over 90% on moving costs" and that Defendant has "saved renters over $2 Billion," when a tenant who would otherwise have received back his or her security deposit will always pay more by using Defendant's product;

f. Misrepresenting the true cost of its product by failing to disclose its billing Fees and processing Fees in its marketing or at any time before account creation and purchase; and

g. Covertly and automatically adding billing fees and processing fees to consumers' payments without adequate or fair disclosure of the fees' existence, of whether they are mandatory, or of how they may be avoided.

10. Plaintiffs and members of the Class viewed and relied upon Defendant's representations and omissions. Had they been aware of the facts Defendant omitted, they would not have purchased Defendant's product and would not have paid the billing fees and processing fees.

11. Defendant committed unfair and deceptive acts and practices in violation of GBL 349. As a direct and proximate result, Plaintiffs and members of the Class paid for a product they would not otherwise have purchased. They paid more for that product than they should have, and they suffered monetary damages for which Defendant is liable.

12. Defendant's conduct was willful and knowing.

13. As a result of Defendant's unlawful actions, Plaintiffs and Class members seek to enjoin Defendant's deceptive and unlawful acts and practices described herein; to recover the greater of their actual damages or fifty dollars ($50.00) per violation; and to recover treble damages, reasonable attorneys' fees, and all other remedies this Court deems proper.

## SECOND CAUSE OF ACTION

**Violations of New York General Business Law § 349**
**Undisclosed Personalized Algorithmic Pricing**
***(By Plaintiffs, individually, and on behalf of the Nationwide Classes)***

14. Plaintiffs, individually and on behalf of the Nationwide Classes, reallege and incorporate the preceding paragraphs as if fully set forth herein.

15. New York General Business Law ("GBL") § 349(a) declares unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state."

16. Defendant's marketing and sale of its Security Deposit Alternative product to tenants for personal, family, or household purposes is consumer-oriented conduct within the meaning of GBL § 349.

17. Defendant does not charge all consumers the same price for the same product. Instead, Defendant's "personalized" prices are computed by automated software analysis of consumer-specific data, including credit report data.

18. Specifically, Defendant explains in fine print not prominently disclosed to consumers that it uses algorithmic pricing.

19. New York's Algorithmic Pricing Disclosure Act, GBL § 349-a, requires any entity that sets a price using personalized algorithmic pricing to display a disclosure, clearly and conspicuously and near the price. The disclosure must state: "THIS PRICE WAS SET BY AN ALGORITHM USING YOUR PERSONAL DATA."

20. In enacting GBL § 349-a, the New York Legislature determined that the way such a price is set is material information that consumers are entitled to know at the point of sale.

21. At no time during the relevant period did Defendant provide that disclosure, or any substantially similar disclosure, on its website, in its sign-up and checkout flow, in its renewal notices, or elsewhere.

22. Defendant's conduct is deceptive and misleading in a material way, independent of its violation of GBL § 349-a. Defendant presents each consumer with a single price, without qualification. It describes its product in uniform terms as a "smart, affordable" replacement for a cash deposit. A reasonable consumer who sees a price presented this way understands it to be the price of the product. A reasonable consumer does not understand it to be a figure that an algorithm individually computed from the consumer's own personal data, and that may exceed what Defendant charges other consumers for identical coverage.

23. Defendant alone knows that its prices are individualized, what personal data it uses, and how that data affects the price. Consumers cannot reasonably discover these facts. Defendant's omission of this information, while affirmatively presenting its price as the price of the product, is likely to mislead a reasonable consumer acting reasonably under the circumstances.

24. Defendant's omission is material. Because landlords direct consumers to Defendant, consumers rely on Defendant's presentation of its price. A consumer who knew the price was algorithmically individualized from personal data could take steps to protect himself or herself, including by seeking a different quote, asking the landlord to accept a traditional refundable deposit or a competing product, or declining Defendant's product. The Legislature's enactment of GBL § 349-a confirms that this information matters to consumers.

25. Defendant's deceptive conduct emanated from New York, where it maintains its principal place of business. On information and belief, Defendant designed, operates, and maintains its pricing algorithm, website, and sign-up flow in New York. Defendant also decided in New York to omit the disclosure, and it processes consumer payments in and from New York. The transactions in which Plaintiffs and Class members were deceived therefore took place in New York within the meaning of GBL § 349.

26. Plaintiffs and Class members were injured as a direct and proximate result of Defendant's deceptive acts and practices. They paid prices that an algorithm set using their personal data, without the disclosure to which they were entitled, and paid more than they would have paid had Defendant adequately informed them of the true nature of its pricing practices.

27. Defendant's conduct was willful and knowing.

28. As a result of Defendant's unlawful actions, Plaintiffs and Class members seek to enjoin Defendant's deceptive and unlawful acts and practices described herein; to recover the greater of their actual damages or fifty dollars ($50.00) per violation; and to recover treble damages, reasonable attorneys' fees, and all other remedies this Court deems proper.

## THIRD CAUSE OF ACTION
**Violations of the Alabama Deceptive Trade Practices Act**
**Ala. Code §§ 8-19-1, *et seq.***
***(By Plaintiff Madden, individually, and on behalf of the Alabama Service Fee Class)***

29. Plaintiff Madden, individually and on behalf of the Alabama Service Fee Class, realleges and incorporates the preceding paragraphs as if fully set forth herein.

30. The Alabama Deceptive Trade Practices Act ("ADTPA"), Ala. Code §§ 8-19-1, *et seq.*, declares unlawful a series of enumerated deceptive acts and practices in the conduct of trade or commerce, including "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or qualities that they do not have," Ala. Code § 8-19-5(5); "[r]epresenting that goods or services are of a particular standard, quality, or grade . . . if they are of another," *id.* § 8-19-5(7); and "[e]ngaging in any other unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce," *id.* § 8-19-5(27).

31. Plaintiff Madden and the members of the Alabama Service Fee Class are "consumers" within the meaning of Ala. Code § 8-19-3, because each is a natural person who

purchased Defendant's product and paid Defendant's Service Fee for personal, family, or household use—namely, to obtain and keep residential housing.

32. Defendant is a "person" within the meaning of Ala. Code § 8-19-3. Defendant's product and the "platform" and "service" for which it charges the Service Fee are "goods" and/or "services" within the meaning of Ala. Code § 8-19-3.

33. Defendant's advertising, marketing, offering for sale, and sale of its product and Service Fee to Alabama tenants constitute "trade or commerce" within the meaning of Ala. Code § 8-19-3. Defendant's conduct directly affects the people of Alabama: Defendant contracts with Alabama landlords, causes its welcome email to be sent to Alabama tenants, directs Alabama tenants through its website and sign-up screenflow, obtains Alabama tenants' bank account and card information, and collects Service Fees and landlord claims from Alabama tenants' accounts.

34. In the course of trade or commerce, Defendant engaged in unlawful trade practices in violation of Ala. Code § 8-19-5(5), (7), and (27) by, among other things:

a. Conflating its product with a "security deposit," including by representing in its welcome email and on its website that a tenant may "qualify" to "rent deposit-free" and can avoid paying a security deposit by using Defendant's "platform," when the product has none of the defining characteristics of a security deposit as that term is understood by reasonable consumers: Payments to Defendant are nonrefundable, no portion of those payments is applied to any landlord claim, and the product must be repurchased for each lease term;

b. Representing that its product lets tenants "[u]se your cash, your way," "move in faster and easier, without paying a large security deposit upfront," and is "[b]uilt to support you" with "support for move-out charge disputes," when in fact the product requires a

tenant to give Defendant standing authorization to withdraw from her bank account or charge her card—immediately, without proof, and without the tenant's agreement as to the amount—whatever sum her landlord claims;

c. Omitting that the Service Fee is never returned to the tenant; that the tenant remains fully liable for every dollar her landlord claims for damage or unpaid rent, in addition to the Service Fee; and that by using Defendant's product the tenant forgoes the protections of Alabama law governing the handling, accounting for, and return of security deposits, including Ala. Code § 35-9A-201;

d. Designing its sign-up screenflow to automatically opt tenants into its product through a prominently highlighted "continue" button while requiring tenants to affirmatively opt out in order to pay a traditional security deposit and providing no cost information at the point of that choice;

e. Withholding the amount of the Service Fee until after the consumer has entered sensitive personal and financial information, including bank account details, and has committed to the checkout process—a "drip pricing" practice; and

f. Representing that the Service Fee "covers the use of our qualification technology and platform," when the Service Fee is not a charge for use of any platform or service, but is a personalized, risk-based charge set by a machine-learning model using the consumer's personal financial information and geography, the overwhelming majority of which is profit to Defendant.

35. Each of the foregoing representations was false and misleading, and each of the foregoing omissions concerned facts that Defendant alone knew and that a reasonable consumer could not discover from Defendant's marketing or sign-up screenflow. The representations and

omissions concerned the characteristics, uses, benefits, qualities, standard, and cost of Defendant's product, and were material to a reasonable consumer's decision whether to use the product and pay the Service Fee.

36. Defendant's conduct is also unconscionable within the meaning of Ala. Code § 8-19-5(27). Defendant, in concert with landlords who hold the keys to a tenant's housing, steers tenants into a nonrefundable, algorithmically priced product costing hundreds of dollars per year that leaves every tenant worse off than a refundable security deposit, and that grants the landlord unencumbered access to the tenant's bank account, all while concealing those facts until the tenant has already been channeled through the sign-up process.

37. Defendant knew or should have known that its representations were false and misleading and that its omissions were material. Defendant designed the welcome email, website, and sign-up screenflow; controls the content of each; and alone knows the true nature of its product and the basis on which it sets the Service Fee. Defendant's violations of the ADTPA were willful and knowing.

38. Plaintiff Madden viewed Defendant's welcome email, website, and sign-up screenflow, and, in reliance on Defendant's representations and without knowledge of the facts Defendant omitted, purchased Defendant's product and paid Defendant $262.90 for the first year of her lease, plus further monthly Service Fees thereafter. Had Defendant disclosed the truth about its product and the Service Fee, Plaintiff Madden would not have used the product and would not have paid the Service Fee.

39. As a direct and proximate result of Defendant's unlawful trade practices, Plaintiff Madden and the members of the Alabama Service Fee Class have suffered monetary damage, including the Service Fees they paid to Defendant, any amounts Defendant withdrew from their

accounts on unsubstantiated landlord claims, and the loss of the benefit of the bargain they believed they were making.

40. This action is timely under Ala. Code § 8-19-14. Plaintiff Madden did not discover, and could not reasonably have discovered, the acts and practices that are the subject of this claim until less than one year before the filing of this action, and the transactions giving rise to this claim occurred less than four years before the filing of this action.

41. Pursuant to Ala. Code § 8-19-10(a), Plaintiff Madden and the members of the Alabama Service Fee Class are entitled to recover their actual damages or $100 per violation, whichever is greater; up to three times their actual damages in light of Defendant's willful and knowing conduct; and their reasonable attorneys' fees and costs. Plaintiff Madden and the Alabama Service Fee Class also seek injunctive and declaratory relief enjoining Defendant's unlawful trade practices, and all other relief this Court deems just and proper.

**FOURTH CAUSE OF ACTION**
**Violations of the Iowa Private Right of Action for Consumer Frauds Act**
**Iowa Code §§ 714H.1, *et seq.***
***(By Plaintiff Taylor, individually, and on behalf of the Iowa Service Fee Class)***

42. Plaintiff Taylor, individually and on behalf of the Iowa Service Fee Class, realleges and incorporates the preceding paragraphs as if fully set forth herein.

43. The Iowa Private Right of Action for Consumer Frauds Act, Iowa Code §§ 714H.1, *et seq.* (the "Iowa Consumer Fraud Act"), provides that "[a] person shall not engage in a practice or act the person knows or reasonably should know is an unfair practice, deception, fraud, false pretense, or false promise, or the misrepresentation, concealment, suppression, or omission of a material fact, with the intent that others rely upon the unfair practice, deception, fraud, false pretense, false promise, misrepresentation, concealment, suppression, or omission in connection with the advertisement, sale, or lease of consumer merchandise." Iowa Code § 714H.3(1).

44. Plaintiff Taylor and the members of the Iowa Service Fee Class are "consumers" within the meaning of Iowa Code § 714H.2, because each is a natural person who purchased Defendant's product and paid Defendant's Service Fee.

45. Defendant is a "person" within the meaning of Iowa Code §§ 714H.2 and 714.16(1). Defendant's product, and the "platform" and "service" for which Defendant charges the Service Fee, are "merchandise" within the meaning of Iowa Code § 714.16(1), which includes "intangibles" and "services," and are "consumer merchandise" within the meaning of Iowa Code § 714H.2, because Defendant offers and sells them to tenants primarily for personal, family, or household purposes—namely, to obtain and keep residential housing.

46. Defendant's welcome email, website, and sign-up screenflow are "advertisements" within the meaning of Iowa Code § 714.16(1), because each is an attempt, by publication, dissemination, solicitation, or circulation, to induce tenants to enter into an obligation to Defendant and to acquire Defendant's product. Defendant's representations and omissions were made "in connection with the advertisement, sale, or lease of consumer merchandise." Iowa Code § 714H.3(1).

47. "Deception" means "an act or practice that is likely to mislead a substantial number of consumers as to a material fact or facts." Iowa Code § 714H.2. An "unfair practice" is "an act or practice which causes substantial, unavoidable injury to consumers that is not outweighed by any consumer or competitive benefits which the practice produces." Iowa Code §§ 714H.2, 714.16(1).

48. Defendant engaged in deception, unfair practices, and the misrepresentation, concealment, suppression, and omission of material facts, in violation of Iowa Code § 714H.3(1), by, among other things:

a. Conflating its product with a "security deposit," including by causing Iowa landlords such as Plaintiff Taylor's landlord to send Defendant's welcome email representing that a tenant may "qualify" to "rent deposit-free," and by representing on its website that a tenant can avoid paying a security deposit by using Defendant's "platform," when the product has none of the defining characteristics of a security deposit as that term is understood by reasonable consumers: payments to Defendant are nonrefundable, no portion of those payments is applied to any landlord claim, and the product must be repurchased for each lease term;

b. Representing that its product lets tenants "[u]se your cash, your way," "move in faster and easier, without paying a large security deposit upfront," and is "[b]uilt to support you" with "support for move-out charge disputes," when in fact the product requires a tenant to give Defendant standing authorization to withdraw from her bank account or charge her card—immediately, without proof, and without the tenant's agreement as to amount—whatever sum her landlord claims;

c. Concealing and omitting that the Service Fee is never returned to the tenant; that the tenant remains fully liable for every dollar her landlord claims for damage or unpaid rent, in addition to the Service Fee; and that by using Defendant's product the tenant forgoes the protections of Iowa law governing the handling and return of rental deposits, including Iowa Code § 562A.12;

d. Designing its sign-up screenflow to automatically opt tenants into its product through a prominently highlighted "continue" button, while requiring tenants to affirmatively opt out in order to simply pay a traditional security deposit, and providing no cost information at the point of that choice;

e. Withholding the amount of the Service Fee until after the consumer has entered sensitive personal and financial information, including bank account details, and has committed to the checkout process—a "drip pricing" practice; and

f. Representing that the Service Fee "covers the use of our qualification technology and platform," when the Service Fee is not a charge for use of any platform or service, but is a personalized, risk-based charge set by a machine-learning model using the consumer's personal financial information and geography, the overwhelming majority of which is profit to Defendant.

49. Each of the foregoing acts and practices is likely to mislead a substantial number of consumers as to material facts, including the nature, cost, and risks of Defendant's product and the basis and purpose of the Service Fee. Each of the omitted facts was known to Defendant alone, could not reasonably be discovered by consumers from Defendant's marketing or sign-up screenflow, and would have been important to a reasonable consumer deciding whether to use Defendant's product and pay the Service Fee.

50. Defendant's acts and practices also constitute unfair practices. They cause substantial injury to Iowa tenants, who pay hundreds of dollars in nonrefundable Service Fees for a product that leaves every tenant worse off than a refundable security deposit and that exposes their bank accounts to unsubstantiated landlord claims. That injury is unavoidable, because tenants are directed to Defendant by the landlords who control their housing, are automatically opted into Defendant's product, and are not told the cost of the product until after they have surrendered their personal financial information. And the injury is not outweighed by any countervailing benefit to consumers or competition.

51. Defendant knew or reasonably should have known that its acts and practices were deceptive and unfair and that its representations and omissions concerned material facts. Defendant designed the welcome email, website, and sign-up screenflow; controls the content of each; and alone knows the true nature of its product and the basis on which it sets the Service Fee.

52. Defendant engaged in the foregoing acts and practices with the intent that consumers, including Plaintiff Taylor and the members of the Iowa Service Fee Class, rely on them. Defendant's welcome email, website, and sign-up screenflow were designed for the specific purpose of inducing tenants to click "continue," to enter their personal and financial information, and to purchase Defendant's product and pay the Service Fee rather than pay a traditional security deposit.

53. Plaintiff Taylor viewed Defendant's welcome email, website, and sign-up screenflow, and, in reliance on Defendant's representations and without knowledge of the facts Defendant concealed and omitted, purchased Defendant's product in lieu of a $1,300 security deposit and paid Defendant a Service Fee of $178.80 for her lease term. Defendant thereafter charged Plaintiff Taylor more than $300 in so-called move-out charges claimed by her landlord. Had Defendant disclosed the truth about its product and the Service Fee, Plaintiff Taylor would not have used the product and would not have paid the Service Fee.

54. As a result of Defendant's prohibited practices and acts, Plaintiff Taylor and the members of the Iowa Service Fee Class have suffered an ascertainable loss of money or property within the meaning of Iowa Code § 714H.5(1), including the Service Fees they paid to Defendant, any amounts Defendant withdrew from their accounts on unsubstantiated landlord claims, and the loss of the benefit of the bargain they believed they were making.

55. Defendant's prohibited practices and acts constitute willful and wanton disregard for the rights of Plaintiff Taylor and the members of the Iowa Service Fee Class. Defendant deliberately structured its marketing and sign-up screenflow to withhold the cost and true nature of its product until tenants had already been channeled into it, and it did so knowing that Iowa tenants would pay hundreds of dollars in nonrefundable fees and would be exposed to unsubstantiated withdrawals from their bank accounts, as a result.

56. Pursuant to Iowa Code § 714H.6(1) and 714H.7, Plaintiff Taylor will provide a copy of this filing to the Iowa Attorney General within seven days of the date of this filing.

57. This action is timely under Iowa Code § 714H.5(5), because it is brought within two years of the occurrence of the last event giving rise to the cause of action and within two years of Plaintiff Taylor's discovery of Defendant's violations.

58. Pursuant to Iowa Code § 714H.5, Plaintiff Taylor and the members of the Iowa Service Fee Class are entitled to recover their actual damages; statutory damages of up to three times their actual damages in light of Defendant's willful and wanton disregard for their rights; and the costs of this action and their reasonable attorneys' fees. Plaintiff Taylor and the Iowa Service Fee Class also seek injunctive and declaratory relief enjoining Defendant's prohibited practices and acts, and all other relief this Court deems just and proper. This claim is brought in addition to, and does not affect, the other claims asserted herein. Iowa Code § 714H.5(6).

## FIFTH CAUSE OF ACTION
**Unjust Enrichment**
***(By Plaintiff, individually, and on behalf of the Class)***

14. Plaintiffs, on behalf of themselves, and on behalf of the Nationwide Class, reallege and incorporate the preceding paragraphs as if fully set forth herein.

15. To the detriment of Plaintiffs and the Class, Defendant was, and continues to be, unjustly enriched because of its wrongful conduct alleged herein.

16. Plaintiffs and the Class conferred benefits on Defendant.

17. Defendant unfairly, deceptively, unjustly and/or unlawfully accepted said benefits, which under the circumstances, would be unjust to allow it to retain.

18. Defendant's unjust enrichment is traceable to, and resulted directly and proximately from, the conduct alleged herein.

19. Plaintiffs and the Class, therefore, seek disgorgement of all wrongfully obtained billing fee and processing fees received by Defendant as a result of its inequitable conduct as more fully stated herein.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment against Obligo for themselves and the Class as follows:

a. Certifying the proposed Class, appointing Plaintiffs as class representatives and appointing their counsel as class counsel;

b. Declaring that Obligo's Billing fee and processing fee and its policies and practices as alleged herein are unlawful;

c. Enjoining the wrongful conduct alleged herein on behalf of the general public, including but not limited to the removal of charges incurred by Plaintiffs and Class members for Obligo's billing fee and processing fee;

d. For an order requiring Obligo to disgorge and make restitution of all monies it acquired by means of the unlawful practices alleged herein;

e. Awarding actual, punitive and statutory damages according to proof;

f. Awarding treble damages as permitted by law;

g. Awarding pre-judgment interest at the maximum rate permitted by law;

h. Reimbursing all costs, expenses and disbursements accrued by Plaintiffs in connection with this action, including reasonable attorneys' fees, costs and expenses, pursuant to law and any other basis; and

i. Awarding such other relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs and the Classes demand a jury trial on all issues in this Complaint that are so triable as a matter of right.

Dated: October 7, 2026

Respectfully Submitted,

*/s/ Michael Reese*
**REESE LLP**
Michael R. Reese
100 West 93rd Street, 16th Floor
New York, New York 10025
Telephone: (212) 643-0500
mreese@reesellp.com

**KALIELGOLD PLLC**
Jeffrey D. Kaliel (*pro hac vice* forthcoming)
jkaliel@kalielpllc.com
1100 15th Street NW, 4th Floor
Washington, D.C. 20005
Telephone: (202) 350-4783

Sophia G. Gold (*pro hac vice* forthcoming)
sgold@kalielgold.com
490 43rd Street, Suite 122
Oakland, California 94609
Telephone: (202) 350-4783

*Counsel for Plaintiffs and the Proposed Classes*